**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 3 0 2023

TAMMY H. DOWNS, CLERK

By: _____
                                    DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

| | |
|---|---|
| CASEY DUNN, Individually and on Behalf of G.D., a Minor; and THOMAS DUNN, | ) )<br>)<br>)    Case No.: **3:23-cv-224-JM** |
| Plaintiffs, | ) )<br>) |
| v. | ) ) |
| ACTIVISION BLIZZARD, INC.;<br>INFINITY WARD, INC.;<br>TREYARCH CORP.<br>SLEDGEHAMMER GAMES, INC.<br>MICROSOFT CORPORATION;<br>EPIC GAMES, INC.;<br>EA DIGITAL ILLUSIONS<br>ELECTRONIC ARTS, INC.;<br>UBISOFT DIVERTISSEMENTS, INC.<br>d/b/a UBISOFT MONTREAL; and<br>UBISOFT ENTERTAINMENT,<br><br>      Defendants. | ) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>) This case assigned to District Judge **Moody**<br>) and to Magistrate Judge **Kearney**<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

Plaintiffs Casey Dunn, Individually and On Behalf Of G.D., a Minor, and Thomas Dunn

hereby file their *Complaint* against the Defendants—Activision Blizzard, Inc.; Infinity Ward, Inc.;

Treyarch Corp.; Sledgehammer Games, Inc.; Microsoft Corporation; Epic Games, Inc.; EA Digital

Illusions; Electronic Arts, Inc.; Ubisoft Divertissements Inc. d/b/a Ubisoft Montreal; and Ubisoft

Entertainment—notifying each Defendant of Plaintiffs' claims for relief as available under

Arkansas law. In support thereof, Plaintiffs allege and state:

## I.   NATURE OF THE ACTION

1.      Video game addiction, also called internet gaming disorder, is a condition

characterized by severely reduced control over gaming habits and increasing priority given to gaming over other activities, resulting in negative consequences in many aspects of a person's life, including self-care, relationships, school and work.

2.      Video game addiction has negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Those suffering often stop interacting with friends and family, exhibit excessive rage, and no longer enjoy other hobbies or activities outside of their video games.

3.      Video game addiction causes rifts between gaming-addicted minors and young adults and their loved ones—rifts beyond that normally experienced between children and their parents or other family members.

4.      Video game addiction and its harmful consequences are only expanding due to the advent of online gaming, cloud gaming, and streaming of games on any device at any time—giving minors unfettered access to "free" games that target those consumers to purchase products within the game to keep playing or for other game perks.

5.      Video game addiction is a world-wide epidemic harming our nation's youth and young adults.

6.      The rapid spread of video game addiction is a proximate result of Defendants' concerted effort to get consumers (*i.e.*, game players) addicted to the Defendants' video games in order to maximize Defendants' profits.

7.      Defendants manufactured, published, marketed, and sold video games, including those played by G.D., that Defendants had *specifically developed and designed* to cause the addiction experienced by G.D. and other users.

2

8.      Defendants use traditional game tactics such as feedback loops and reward systems, along with patented designs containing addictive features and technology to ensure its users keep playing longer and spending more on "microtransactions" within the game.

9.      Defendants rely on microtransactions to increase their profits from individual games.

10.      Defendants design their games to keep consumers playing—and spending—by enlisting the help of behavioral psychologists and neuroscientists to conduct state-of-the-art research and to collect data that Defendants use to develop and design their games to be as addictive as possible—especially to minors and young adults.

11.      Defendants' motive in developing, designing, manufacturing, publishing, and selling addictive video game software is their own bottom line.

12.      By making their games addictive, Defendants maximize profits after the original purchase or free download. Within their games, Defendants offer significant opportunity to purchase downloadable game content or in-game transactions, known as "microtransactions," to allegedly give players an advantage in the game.

13.      "Microtransactions" often occur as a result of Defendants' use of "friends," targeted advertisements, or other deceptive tactics built into Defendants' video games. Thus, the more times a player comes back to play a game, the more times they are subjected to Defendants' deceptive and harmful conduct and more likely to spend more money within the game in order to keep playing, thereby increasing Defendants' bottom line.

14.      By keeping minors and young adults playing longer—and spending more in the game in the process—Defendants are consistently increasing their revenue.

3

15.    By acquiring—and addicting—users when they are young, Defendants are securing their profit stream by ensuring future engagement and monetization as these young users age.

16.    Defendants are exploiting consumers, particularly minors and young adults, through the use of unfair, unconscionable, and deceptive trade practices and conduct that prioritizes gamer engagement and spending over gamer safety.

17.    Video game addiction impacts thousands of youths and their families across the country, including in Arkansas.

18.    G.D. and his parents, Casey and Thomas Dunn, are one of those families who have been negatively impacted by the addiction caused by each of Defendants' products.

19.    Defendants' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, described herein, proximately caused G.D.'s gaming addiction.

20.    As a result of gaming addiction, G.D. specifically has experienced severe emotional distress, physical injuries, diminished social interactions, a drop in grades and inability to attend school, depression, lack of interest in other hobbies and sports, withdrawal symptoms such as rage, anger, and physical outburst, and diagnoses of ADHD and Dyslexia.

21.    As a result of G.D.'s gaming addiction, G.D. has required an Individualized Educational Plan ("IEP"), out-patient counseling, and Focalin medication to control impulsivity and lack of control.

22.    G.D.'s gaming addiction has also had negative effects on their relationship with their father, Thomas Dunn.

23.    Plaintiffs have been injured and harmed as a proximate result of Defendants' actions and misconduct; for that they are entitled to compensation and other damages under Arkansas law.

24.     Defendants, individually and collectively, have willfully and knowingly engaged in fraudulent, deceptive, unfair, immoral, outrageous, wanton, and reckless behavior that damaged and continues to harm not only Plaintiffs, but countless other Arkansans and citizens of the world. For this they should be punished and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

## II.     PARTIES

25.     G.D., a minor, is and at all times relevant to this action, was a citizen and resident of the State of Arkansas whose principal place of residence being in Poinsett County, Arkansas.

26.     G.D. is 13 years old at the time of filing of this lawsuit.

27.     G.D. played or plays the following video games: Fortnite, Rainbow Six, Battlefield, and Call of Duty.

28.     G.D. downloaded the games through Google Play and the Microsoft Store, and also plays through Xbox Game Pass Cloud Streaming.

29.     G.D. subscribes to and plays games on Xbox Game Pass Ultimate.

30.     G.D. currently plays games on his Xbox Series X, Nintendo Switch, and on his Android mobile phone.

31.     Plaintiff Casey Dunn is, and at all times relevant to this action was, a citizen and resident of the State of Arkansas whose principal place of residence is in Poinsett County, Arkansas.

32.     Casey Dunn is the mother of G.D. and represents G.D.'s interests in this lawsuit. She also seeks redress on her own behalf, seeking damages for loss of society and companionship, as well as for economic injuries and losses sustained as a result of Defendants' unlawful, negligent,

5

fraudulent, reckless, intentional, and deceptive conduct that proximately caused G.D.'s gaming addiction.

33.    Plaintiff Thomas Dunn is, and at all times relevant to this action was, a citizen and resident of the State of Arkansas whose principal place of residence is in Poinsett County, Arkansas.

34.    Thomas Dunn seeks redress on his own behalf, seeking damages for loss of society and companionship, as well as for economic injuries and losses sustained as a result of Defendants' unlawful, negligent, fraudulent, reckless, intentional, and deceptive conduct that proximately caused G.D.'s gaming addiction.

35.    Defendant Activision Blizzard, Inc. ("Activision") is a Delaware corporation with its principal place of business at 2701 Olympic Boulevard Building B, Santa Monica, CA 90404.

36.    At all times material hereto, Activision developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Call of Duty series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

37.    Defendant Infinity Ward, Inc. ("Infinity Ward") is a Delaware corporation with its principal place of business at 21255 Burbank Blvd, Ste 600, Woodland Hills, CA 91367.

38.    At all times material hereto, Infinity Ward developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Call of Duty series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

39.    Defendant Treyarch Corp. ("Treyarch") is a Delaware corporation with its principal place of business at 3420 Ocean Park Blvd., Santa Monica, CA 90405.

6

40.     At all times material hereto, Treyarch developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Call of Duty series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

41.     Defendant Sledgehammer Games, Inc. ("Sledgehammer Games") is a Delaware corporation with its principal place of business at 1001 E Hillsdale Blvd., Ste 610, Foster City, CA 94404.

42.     At all times material hereto, Sledgehammer Games developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Call of Duty series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

43.     Defendants Activision, Infinity Ward, Treyarch, and Sledgehammer Games acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Call of Duty series with all the addictive features and technologies contained therein.

44.     Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, NC 27518.

45.     At all times material hereto, Epic Games developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Fortnite series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

46.     Defendant EA Digital Illusions CE AB ("DICE") is a Swedish company with its principal place of business in Stockholm, Sweden.

7

47.     At all times material hereto, DICE developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Battlefield series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

48.     Defendant Electronic Arts, Inc. ("EA") is a Delaware corporation with its principal place of business at 209 Redwood Shores Parkway Redwood City, CA 94065.

49.     At all times material hereto, EA developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Battlefield series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

50.     DICE and EA acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Battlefield series with all the addictive features and technologies contained therein.

51.     Defendant Ubisoft Divertissements Inc., d/b/a Ubisoft Montreal ("Ubisoft Montreal") is a Canadian corporation with its principal place in Montreal, Quebec, Canada.

52.     At all times material hereto, Ubisoft Montreal developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Rainbow Six series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

53.     Defendant Ubisoft Entertainment SA ("Ubisoft") is a French company with its principal place in Pasteur, France.

8

54.     At all times material hereto, Ubisoft developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Rainbow Six series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

55.     Ubisoft Montreal and Ubisoft acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Rainbow Six series with all the addictive features and technologies contained therein.

56.     Defendant Microsoft Corp. ("Microsoft") is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, WA, 98052. Microsoft is authorized to and does business in the State of Arkansas. Microsoft's registered agent for service of process in Arkansas is Corporation Service Company, 300 Spring Building, 300 S. Spring Street, Suite 900, Little Rock, AR 72201.

57.     At all times material hereto, Microsoft developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox Series X either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs, and developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold subscriptions to Xbox Game Pass to members of the general public within the State of Arkansas, including to Plaintiffs.

58.     Microsoft acted in concert with Activision, Infinity Ward, Treyarch, Sledgehammer Games, Epic Games, DICE, EA, Ubisoft Montreal, and Ubisoft to distribute, market, supply, and/or sell the Call of Duty, Fortnite, Battlefield, and Rainbow Six video games and all in-game

downloadable content and in-game purchases contained therein in an effort to increase Defendants'
revenue at the expense of consumers, including Plaintiffs.

59.     On October 13, 2023, Microsoft acquired Activision for $68.7 billion.[1] This
acquisition has no impact on Activision's liability for the harm it caused Plaintiffs, and Microsoft
is responsible for any damages that may be assessed against Activision.

60.     Upon information and belief, each Defendant was aware—or should have been
aware—that other game developers and publishers, including the other Defendants named herein,
were engaging in the same unlawful, deceptive, negligent, outrageous, immoral, and reckless
behavior.

61.     Upon information and belief, Activision, Infinity Ward, Treyarch, Sledgehammer
Games, Epic Games, DICE, EA, Ubisoft Montreal, Ubisoft, and Microsoft acted in concert and
entered into licensing agreements to utilize the same patents to keep users, including minors like
G.D., addicted to Defendants' video games.

62.     At all times material hereto, each Defendant targeted consumers/purchasers,
including minors like G.D., to (1) purchase and/or play its video games and (2) to purchase in-
game items or perks in exchange for real money, known as "microtransactions," through in-game
advertising and "fake" avatar friends.

63.     Each Defendant—with knowledge of G.D.'s age and Arkansas residency—targeted
G.D. and induced them to enter into thousands of dollars of microtransactions.

---

[1] *See Microsoft closes $69 billion acquisition of Activision Blizzard after lengthy regulatory review*,
CNBC,        https://www.cnbc.com/2023/10/13/microsoft-closes-activision-blizzard-deal-after-
regulatory-review.html (Oct. 13, 2023).

### III.    JURISDICTION AND VENUE

64.    Plaintiffs' reallege and incorporate by reference each of the preceding paragraphs of the *Complaint*.

65.    This *Complaint* brings forth claims for relief arising under the laws of the State of Arkansas, including but not limited to allegations that as a direct and proximate result of Defendants placing the defective gaming products into the stream of commerce, Plaintiffs have suffered and continue to suffer both injuries and damages, as described herein, within the State of Arkansas that exceed the sum or value of $75,000, exclusive of interest and costs..

66.    This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

67.    This Court has personal jurisdiction over each Defendant because each routinely conducts business in Arkansas and has sufficient minimum contacts in Arkansas to have intentionally availed itself to this jurisdiction by marketing video games and transacting business in the State of Arkansas.

68.    At all relevant times, each Defendant was present and transacted, solicited and conducted business in the State of Arkansas through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

69.    Defendants are conclusively presumed to have been doing business in this State and are subject to Arkansas's long arm jurisdiction.

70.    At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within Arkansas and throughout the United States.

71.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiffs are all residents of this District and citizens of this State; (b) each Defendant

11

directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

## IV.   GENERAL ALLEGATIONS

### A. The Rise of Video Games

72.    A "game" is a closed, formal system that engages players in structured conflict and resolves its uncertainty in unequal outcome. Games are closed in the fact that once engaged in the game, the player sets aside their rules for daily life and accepts the rules of the game as the status quo.

73.    A "video game" specifically is an object or device that stores recorded data or instructions generated by a person who uses it, and by processing the data or instructions creates an interactive game capable of being played, viewed, or experienced on or through a computer, gaming system, game console, or other technology.

74.    Unlike traditional games of chance, video games require active, lengthy participation, during which players are exposed to the psychological techniques designed to manipulate and exploit this vulnerable population.

75.    Such manipulation and exploitation is possible—and common—because video games have little regulation beyond the Entertainment Software Ratings Board ("ESRB").

76.    The first video games were sold in the 1970s, and by the mid-1980s, many video game franchises were released that are still in production today.

77.    The industry is yet young, and in a short period of time has rapidly evolved from gaming machines to games on virtual and augmented reality platforms.

78.     Early video game companies would create games and sell them mostly through physical cartridges or discs and the costs of developing the game, and profits, were realized through the sale of their games over a period of time—a long and slow method of earning profits.

79.     A new revenue model based on in-game purchases was created that would allow the publishing companies to earn more profits over a very short period of time. This model is driven by increasing a minor's game play time and keeping them engaged to assure addiction and increase in-game purchases.

80.     Today's technology enables video games on a scale unimaginable 20 years ago. From open-world games with hundreds of square miles to explore to role playing games ("RPGs") that can take hundreds of hours to beat, there is a staggering amount of content in modern games.

81.     The video gaming market grew slowly, taking more than 35 years to reach $35 billion; however, between 2007 and 2018, the industry has grown by more than $100 billion to $137.9 billion.

82.     The global video game industry occupies a special place in the entertainment and media market, now being one of the fastest-growing segments.

83.     In 2023, the video game industry's revenue was $365.6 billion globally.

84.     With the advent of in-game purchasing systems, video games as a consumer product have thrived from in-game purchases. Most of these purchases have been made by minors like G.D.

85.     The explosive growth of the video game industry has been fueled by patented "monetization schemes" that target minors who are induced to make several in-game purchases, or "microtransactions," of downloadable content.

86.     Often, there is no meaningful disclosure of the inclusion of microtransactions in the game at the time of download or the use of psychological mechanisms employed within the games for consumers or parents to make informed decisions about the appropriateness of games.

87.     To entice minors to make such in-game purchases, video game developers and publishers, like Defendants, rely on minors and young adults becoming addicted to their video games so they play for more hours and spend more money in microtransactions.

**B. Microtransactions**

88.     Instances where players are able to spend real money for in-game items or perks are known as "microtransactions" (sometimes abbreviated "mtx").

89.     The gaming industry calls such purchases "microtransactions" because a single virtual item is often relatively low in price, but often they are bundled together in "value" packs, or games require players to purchase them repeatedly in order to meaningfully advance the game.

90.     Some games allow players to purchase items that can be acquired through normal means; players may opt to make such purchases if they lack the skill or available time to earn the items through regular game play.

91.     Some games, however, heighten exclusivity by including items that can only be obtained through microtransactions.

92.     Microtransactions are often used in free-to-play games to provide a revenue source for the developers and publishers. Such free-to-play games that include a microtransaction model are sometimes referred to as a "freemium."

93.     While microtransactions are a staple of mobile app games, they are also seen on PC software and console gaming.

94.     Microtransactions first appeared in 2006 but did not prove to be a good profit-making model for developers and publishers until smartphones started to get more powerful and more players started switching to mobile gaming.

95.     In 2012, there was a huge rise of microtransactions mostly because of mobile gaming titles, and they became the normal model across the video gaming industry by 2014.

96.     Microtransactions are most commonly provided through a custom store interface placed inside the app or game for which the items are being sold.

97.     Developers and publishers can also use microtransactions to lock potentially significant content behind paywalls.

98.     Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are non-essential components of the game and are planned in advance by companies.

99.     The market strategy for the game developers and publishers is that in the long term, the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game.

100.    This is because microtransaction spending can easily—and quickly—add up to hundreds, or even thousands, of dollars.

101.    This new model heavily relies on patented algorithms built into the game, yet concealed from users, to ensure revenues earned by a video game are recurring for as long as the game is available and players are playing it.

102.    Microtransactions rely on the impulsive behavior of players and the gaming environment and peer pressure to drive purchases.

103.     For instance, placing a time limitation on a microtransaction offer may push a user to impulsively buy a particular item. Similarly, a player's desire to be the first among a group of friends to buy an in-game premium item or achieve a higher-ranking drive players to make microtransaction purchases.

104.     Today, microtransactions make up 30% of the total gaming revenue earned across the industry.

105.     Microtransactions are not only benefiting the gaming industry publishers and developers; the platforms that allow the microtransactions take a cut of the revenue from each purchase—typically about 30% depending on the size of the app developer. For example, Google, Apple, and Steam all receive revenue for in-game purchases made on games downloaded through their platforms.

106.     While these corporate industries are benefiting from the microtransaction model, the most vulnerable to these manipulative monetization schemes are America's youth and young adults.

107.     Each Defendant knows this, or should be aware of this, because they have purposefully designed their video games to be addictive and rely on microtransactions to make money from this vulnerable population.

### C.  The Monetization Schemes Built into Video Games

108.     Predatory monetization schemes in video games are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until players are already committed, both psychologically and financially.

109.    The schemes use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated play and increased spending among users, especially among vulnerable populations like minors.

110.    Specifically, such tactics may involve, either singularly or in combination: limited disclosure of the product, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

111.    Game developers and publishers utilize many strategies to enhance the predatory monetization tactics in their games. Such strategies include:

        a.  The "near miss": convincing players via exciting animation, for instance, that they were very close to winning;

        b.  "Chasing": encouraging players to keep playing to get back any money they just lost;

        c.  "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window;

        d.  "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately;

        e.  "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; or

        f.  The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

112.    The psychological tactics described in the foregoing paragraph are only one part of the predatory monetization schemes.

113. Some games also permit a player limited or temporary possession of a certain item to encourage urgent use and/or additional purchasing. Others give only limited disclosure or misrepresentation of important conditions of the purchase, including the long-term value or utility of a purchased item.

114. Another noteworthy aspect of predatory monetization is the collection and use of individual player data to manipulate the nature and presentation of purchasing offers in ways that maximize the likelihood of the player spending money. Specifically, the games are capable of tracking various player metrics and adjusting their design in automated ways to elicit in-game purchasing.

115. Such schemes exploit an information asymmetry between purchaser and provider, in that the game system knows more about the player than the player can know about the game. This allows the gaming industry to use its knowledge of the player's game-related preferences, available funds, and/or playing and spending habits to present offers predetermined to maximize the likelihood of eliciting player spending.

116. Games linked to players' social network pages also gather information from these pages in order to personalize content to players' unique interests and preferences.

117. As the game system gathers more data on how various types of players behave under certain conditions, the game becomes better equipped to present in-game events and purchasing situations that will elicit the desired behavioral outcome (*i.e.,* spending or playing longer).

118. The prices of in-game items may be determined by factors that are not disclosed to the player because the algorithm takes into account the player's available funds and cost sensitivity

to certain items. This allows the game to incentivize continuous spending, while offering limited or no guarantees or protections.

119.    As the playing population as a collective invest more and more time in the game, the game system may become more adept at "knowing" each player, both individually and as part of its group.

120.    Such systems that dynamically adjust in-game item prices and value based on individual player analytics, which were primarily implemented by developers to serve monetary goals and which lack basic transparency to the player, may have the potential to exploit certain types of vulnerable players under certain conditions.

121.    These continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for children to stop understanding the value of the actual money being spent and continue spending more and more.

122.    A few specific examples of predatory monetization schemes include Defendants' sale of loot boxes, pay-to-win models, and rubber-banding.

### i.   Loot Boxes

123.    A "loot box" is an in-game reward system that can be purchased repeatedly—with real money—to obtain a random selection of virtual items. Loot boxes could contain items that give players an advantage in the game, or cosmetic items that can be used to customize characters or weapons.

124.    Through purchasing a loot box, the player acquires a seemingly random assortment of items.

125.    The low probability of obtaining a desired item in a loot box means that the player will have to purchase an indeterminate number of loot boxes to obtain the item.

126.     Loot boxes require no player skill and have a randomly determined outcome (*i.e.*, prize).

127.     Loot prizes are essentially a lottery—a way for gaming developers, publishers, and even game platforms to increase revenue through underage gambling.

128.     It is common knowledge that gambling addiction is a severe issue and a big risk when playing lottery-style games, so combining these aspects with the psychologically addictive traits of video games is highly dangerous for players.

129.     After being compared to gambling, many games started adding probability to earn respective items in their loot boxes. However, the odds are still extremely against the players; rare items have incredibly low probabilities such as 0.08%.

130.     Loot boxes still have the same designs, opening of animations, and more features to release dopamine leading to players purchasing more microtransactions—much like the tactics used in gambling.

131.     Loot boxes are also ultimately controlled by the gaming developers and publishers, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the game design.

132.     Loot boxes result in high revenues for the gaming developers and publishers, like Defendants, because instead of a one-time purchase for the desired item, users may have to buy multiple boxes.

**ii. Rubber-Banding**

133.     Another example of a monetization scheme is "rubber-banding."

134.    Games have long employed rubber-banding to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the player's skill level. For instance, matching computer opponents to a player's skill level.

135.    Game developers and publishers also use this same principle of rubber-banding with microtransactions to ensure that the game's financial requirements are adjusted to match the player's desire and capacity to pay.

136.    In this sense, the "difficulty" of a monetized game may be considered analogous to the player's cost sensitivity or the willingness of the player to make continued in-game purchases.

137.    If an item costs too much, then the players of monetized games cannot strategize to win, but instead must decide between making in-game purchases or not playing at all, or potentially playing without paying, but doing so with significantly diminished in-game capability that generate regular feelings of frustration.

138.    Such technical sophistication in these purchasing systems aim to reduce the player's uncertainty or reluctance regarding purchasing decisions.

**iii. Pay-To-Win**

139.    Some games operate on a "pay-to-win" model, a type of predatory monetization scheme that incentives players who pay more.

140.    Players who are willing to shell out more money get a disproportionate advantage over other players, particularly if the items cannot be obtained through free means.

141.    For example, paying players may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make them impossible to beat by ordinary, non-paying players.

21

142.   Games with such imbalances may prevent the non-paying players from progressing or remaining competitive.

**D. Patents Target Minors to Increase In-Game Spending**

143.   Several video game developers and publishers have incorporated these design strategies into gaming patents that contribute to higher risk consumer behavior.

144.   However, game companies often seek to keep their intellectual property confidential. As such, there are very few objective, transparent, or complete accounts on the precise nature of monetization in their games.

145.   Several patents shed light on the innovative video game monetization invented to nudge users into making in-game purchases, including:

   a. U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment LLC, describes an invention that encourages users to make in-game purchases when they face a difficult scenario, such as "kill[ing] a particular monster . . . or player character." Such an offer is referred to by Luchene as an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered."

   b. U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing Inc., similarly describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on his or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

22

.

c. U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (e.g., of interest to) a first player," then locates "a second user that has acquired (e.g., purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

d. U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

e. U.S. Patent No. 9,138,639 B1, assigned to Kabam Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

f. U.S. Patent No. 702,523 B2, assigned to Microsoft Technology Licensing LLC, was created to capitalize on a player's tendency to commit to a purchase after investing significant time into the game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user

23

. . . that the achievement will not be recorded unless they purchase the full version of the game at that time."

g.  U.S. Patent No. 9,795,886 B1, assigned to EA, allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

h.  U.S. Patent No. 10,252,170 B2, assigned to Hasbro Inc., encourages players to make purchases outside of a game to receive in-game benefits. Players can earn in-game points for scanning codes that come with separately purchased physical toys.

i.  U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

j.  U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a

time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

k. U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

l. U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

m. U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively

25

decreases based on a number of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

n. U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

o. U.S. Patent App. No. 2016/0346677 A1, assigned to EA., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

p. U.S. Patent App. No. 2016/0346677 A1, for which Sony Interactive Entertainment LLC has applied and which is currently pending, seeks to patent technology that would suggest microtransactions to players who are stuck in the game. This patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective.

146. There was once a time when such lopsided consumer video game monetization-related invention would have been patent ineligible. However, because of the introduction of these patents, game developers and publishers are able to further deceive and harm society's most vulnerable—minor children—while lining their own pockets.

26

147.    The mere fact that one video game publisher or developer holds a patent on certain monetized technology does not mean that similar schemes are not in other companies' games.

148.    It is common practice for developers and publishers, like Defendants, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buy the rights to the patent outright.

**E. These Predatory Monetization Schemes Attract "Whales" to Defendants' Games**

149.    What players, like G.D., often do not understand is that their gaming experience is not accidental, but rather, carefully engineered by the game's manufacturers.

150.    In every game, there are several hundred, or maybe even thousands, of heavy players who spend much more money in the game than the other players.

151.    Companies employ tactics specifically to gain heavy users—or "whales" or "VIPs"—and to induce them into spending more money. For instance, when "whales" get stuck in the game, they are given a bonus to continue because it is better for the gaming companies to give them occasional free things than for the players to get fed up and stop paying.

152.    Gaming companies, like Defendants, have specialized departments within their companies to focus on these "whales" or "VIPs," to stay in contact with them, and to form relationships with them.

153.    To target those who may be likely to spend additional money in the game, game developers and publishers, like Defendants, will monitor players and collect user information, from their game play to their social networks. Companies can then further target these users with advertisements or offers in an effort to increase their revenue at the expense of the player.

154.    The gaming industry is built on those consumers who "maintain the game" and in turn create the revenue for the game companies. The proportion of heavy users significantly

increases revenue numbers for these companies. By monetizing player addiction, game companies notably increase their bottom line.

### F.   Defendants Include Specific Features in their Games to Keep Players Engaged – and Addicted

155.    In addition to microtransactions, video games include several additional features to keep players engaged and playing longer, including the use of algorithms, feedback loops, continuously adding new game content, and using tactics to ensure users are creating habits in their gameplay.

156.    Many gaming features now are based on algorithms within the game to manipulate the type of play that users are experiencing.

157.    For instance, Activision in particular holds numerous patents that provide a framework of artificial intelligence to monitor, analyze, and control users' game time to increase game play time and fuel additional purchases.[2]

158.    Upon information and belief, Activision works in concert with the other Defendants to license this patented technology and allow all Defendants to control users' experiences within the game.

159.    Defendants are also utilizing several psychological tools to increase game play time, such as the use of feedback loops.

160.    Feedback loops are systems where the game reacts to how well the player is doing in order to make the games more rewarding, or for tougher games, more challenging.

161.    Feedback loops are a core part of video games because developers and publishers have a vested interest in making players want to play their games for as long as possible.

---

[2]    *See*   Patents   assigned   to   Activision   publishing,   JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

162.    There are two kinds of feedback loops: positive and negative.

163.    Positive feedback loops mean that when you're doing well, the game rewards you with things to help you do even better.

164.    Negative feedback loops, on the other hand, add a challenge to a game when you are doing too well.

165.    Feedback loops are used to bring balance to games that would otherwise get too difficult or too boring.

166.    By introducing both positive and negative feedback loops into a game, designers can build a dynamic level of difficulty control.

167.    A player's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core game's challenges is curtailed by the use of negative feedback loops.

168.    When done well, feedback loops enhance the player's experience by maintaining a consistent level of challenge throughout a game, while still rewarding the player for their achievements.

169.    In theory, this creates the holy grail of the games design world, a game that maintains the feeling of challenge and achievement for the entirety of the game and keeps players playing longer.

170.    Gaming companies, like Defendants, also know that the best way to get a player to come back to the game and spend money is to make the game a habit or part of their life.

171.    Creating a habit consists of a cycle of three things: reminder, routine, and reward. The specific purpose of these rewards is to create a daily routine, and ultimately a habit, of playing the game for the user.

29

172.     Gaming companies, like Defendants, know this and use deceptive and unfair tactics to keep players coming back multiple times a day to play. For instance, gaming companies, like Defendants, try to addict players to their games by providing daily rewards or time-released rewards to keep players consistently coming back.

173.     Another tactic gaming companies, like Defendants, use to addict players is to add more game content over time thereby keeping users playing over a longer period of time.

174.     By constantly adding downloadable content, *e.g.*, expansion packs and microtransactions, Defendants make it hard for players to finish a game while simultaneously keeping them hooked in the content and the game.

**G. Cloud Gaming Enhances Defendants' Predatory Activities**

175.     Not only do individual games have predatory strategies built in to encourage users' spending and continued play, but several games are also now available on cloud-based systems.

176.     Cloud gaming, or gaming on demand, is a type of online gaming that runs video games on remote servers and streams them directly to a user's device.

177.     Traditionally, games would run locally on a user's video game console, personal computer, or mobile device.

178.     Cloud gaming platforms allow users to stream any game available on the platform at any time.

179.     Cloud gaming eliminates the need for users to purchase expensive computer hardware or install games directly onto a local game system.

180.     This means players have easy access to hundreds or even thousands of games at one time.

30

181.    What's more, the catalogue of games on streaming platforms is ever-changing and evolving.

182.    The never-ending availability of a wide variety of games encourages users to stay engaged with the streaming platform, by ensuring they always have something new and different to play.

### H. Defendants' Predatory Schemes Created a Generation of Gaming Addicts

183.    The feedback loops, other psychological properties, and cloud gaming platforms are designed to keep players continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the game, so the game can bombard the minor with solicitations to purchase additional downloadable game content and/or loot boxes based upon psychological behavioral analyses that employ addiction methodology to seduce the minor to increase playing time and remain in the game. Essentially, the feedback loops, platforms, and predatory monetization schemes work together to addict players to the games.

184.    During the last three decades, video games have become one of the major pastimes and one of the most growing industries worldwide. Today, 67% of all Americans play video games.[3]

185.    The very nature of action-entertainment games not only attracts young people with focus, attention, and anger issues (particularly in the case of violent video games), but it also tends to reinforce these negative behaviors.

---

[3] Hosseini et al., *Computer Gaming and Physiological Changes in the Brain: An Insight from QEEG Complexity Analysis*. 46(3) APPLIED PSYCHOPHYSIOLOGY AND Biofeedback 301 (2021).

186.    In 2008, the American National Purchase Diary ("NPD") group reported that 3% of the 174 million players using PC, MAC, or game consoles were extreme gamers who are playing an average of 45 hours a week. NPD reported that the percentage of extreme gamers had increased to 4% by 2010.[4]

187.    Gaming addiction, also known as gaming disorder or internet gaming disorder ("IGD"), is characterized by severely reduced control over gaming habits, resulting in negative impacts on daily functioning, including personal, social, educational, an occupational responsibilities.

188.    IGD is a growing and prolonged behavioral pattern of gaming, leading to behavioral and cognitive syndromes. Those affected not only experience increased loss of control over gaming, but also increased tolerance and the presence of withdrawal syndrome if unable to play at increasing periods of time.

189.    Gaming addicts are usually 12 to 20 years of age and spend a minimum of 8-10 hours playing video games. Preventing them from playing can lead to tension and anger and they may spend long stretches of time playing—without food or sleep.

190.    IGD can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests without regard for the negative consequences.

191.    The main features of IGD are impaired control over gaming, increasing priority given to gaming over other activities, and continuation or escalation of gaming despite negative consequences.

---

[4] *Id.*

192.    The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), the manual used by clinicians and researchers to diagnose and classify mental disorders, recognizes gaming disorder as a condition for further study that warrants more clinical research and experience.

193.    Gaming disorder is the only behavioral addiction recognized in the DSM-5.

194.    The DSM-5 acknowledges that several consequences from gaming disorder arise within only 5 to 12 weeks of beginning to play.

195.    Likewise, gaming disorder, with both online and offline variants, has been included in the International Classification of Diseases ("ICD-11"), the global categorization system for physical and mental illnesses published by the World Health Organization.

196.    The American Psychiatric Association ("APA") suggests the effects or symptoms of IGD may be similar to those of other proposed psychological addictions.

197.    For instance, IGD may be an impulse control disorder similar to compulsive gambling.

198.    The APA has developed nine criteria for characterizing internet gaming disorder: (1) preoccupation with internet games; (2) withdrawal symptoms when internet gaming is taken away; (3) tolerance, resulting in the need to spend increasing amounts of time engaged in internet games; (4) unsuccessful attempts to control participation in internet games; (5) loss of interests in previous hobbies and entertainment as a result of, and with the exception of, internet games; (6) continued excessive use of internet games and despite knowledge of psychosocial problems; (7) deceiving family members, therapists, or others regarding the amount of internet gaming; (8) use of internet games to escape or relieve negative moods; and (9) jeopardizing or losing a significant relationship, job, or education or career opportunity because of participation in internet games.

199.    These nine criteria are also outlined in the DSM-5.

200.    Using these nine criteria, the IGD-20 Test was developed and was the first standardized psychometric tool to assess internet gaming disorder.

201.    The IGD-20 Test includes twenty (20) questions designed to assess the extent of problems caused by disordered gaming and the degree of symptoms experienced by gamers.

202.    The IGD-20 Test conceptualized disordered gaming according to the six first-order latent components well-established in behavioral addictions: salience, mood modification, tolerance, withdrawal symptoms, conflict, and relapse.

203.    The Internet Gaming Disorder Scale-Short-Form ("IGDS9-SF") was then created, as a brief standardized psychometric tool to assess gaming disorder.

204.    The IGDS9-SF includes a total of nine items reflecting the nine clinical criteria identified by the APA.

205.    Another commonly used instrument for the measurement of addiction is the Problem Video Game Playing ("PVP") Questionnaire, which is a scale measured by using a survey containing nine yes-or-no questions.

206.    The PVP Questionnaire's survey questions are based on the DSM criteria for substance dependence and for pathological gambling, as well as the literature on addictions.

207.    Approximately 3-4% of gamers are addicted to video games. In a 2021 systematic review and meta-analysis, the global prevalence of gaming disorder was found to be 3.05%, meaning as many as 60 million people (or more) are suffering from gaming disorder.

208.    These statistics are even higher for minors: 8.5% of youths aged between 8 and 18 suffer from gaming disorder.

34

209.     Moreover, comorbidity studies also indicate that individuals with attention deficit hyperactivity disorder (ADHD) may have an increased susceptibility to developing gaming disorder.

**I.   Effects of Video Games on Adolescent Brains**

210.     Researchers have concluded that excessive use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction.

211.     Moreover, clinical evidence has shown that subjects addicted to online games experience biopsychological symptoms and complications. These symptoms may include the traditional symptoms of drug addiction, such as hangover, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

212.     In 2008, the United States Federal Communications Commissioner said that online gaming addiction is one of the top reasons for college dropouts in the U.S.

213.     Furthermore, empirical studies indicate that internet gaming disorder is associated with detrimental health-related outcomes.

214.     Brain imaging studies have shown that long-term video game playing affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

215.     Other studies have shown excessive use of videogames leads to more negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

216.     The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30.

217. The executive control center of the prefrontal cortex is essential for weighing risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals.

218. This may explain why young people are more likely to engage in hours of play while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw on, minors and young adults are less able to weigh negative consequences and curb potentially harmful behavior like excessive video gaming, continuing to impact frontal lobe development.

219. Brain imaging studies have also shown structural changes in the brain, particularly a reduction in and white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and gray-matter volume (associated with emotions, perception, memory, and motor control). Specifically, several regions of the brain showed reduction in gray-matter volume:



Regions that showed reduced gray-matter volume in IGD participants in more than two studies.[5]

---

[5] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

220.    Similarly, brain activation studies have shown that videogame playing involved changes in reward and loss of control, and that gaming pictures activate regions like those activated by cue-exposure to drugs.

221.    Activation studies also show evidence that individuals with IGD have impaired inhibition, and that video game cues activate craving, attention, and executive function areas of the brain. These cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged exposure:



Regions that showed activation in response to internet and video game cues in IGD participants in more than two studies.[6]

222.    Structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward.

223.    One comparison study of young adults with a mean age of 24 also revealed that individuals who engage in excessive internet gaming tend to have lower cognitive function, especially in terms of verbal ability and working memory.

224.    Further, videogame play is associated with dopamine release similar in magnitude to that of drug abuse and gambling.

---

[6] *Id.*

225.     These increased dopamine releases in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is taken away or is unavailable to play.

226.     As the APA has explained, gaming disorder specifically leads to the need to spend more time gaming, an inability to reduce time spent gaming, and unsuccessful attempts to quit gaming.

227.     As concern over video game addiction grows, the use of psychopharmacology, psychotherapy, twelve-step programs, and use of continually developing treatment enhancements have been proposed to treat this disorder.

228.     By designing and distributing these games with addictive technologies, Defendants ensured that they could increase and extend profits by addicting their most vulnerable users. They created, then exploited, an addiction among this country's most vulnerable, and Plaintiffs seek to hold them accountable.

**J.  G.D.'s Addiction, Injuries, and Damages**

229.     G.D. is a 13-year-old individual addicted to video games; specifically, Fortnite, Call of Duty, Battlefield, and Rainbow Six.

230.     G.D. spends approximately 13 hours per day playing these games.

231.     G.D. cannot control their gameplay or spending in the game, and they will sometimes sneak to play video games after the rest of their family has gone to bed.

232.     G.D. has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Dyslexia, and has also experienced the following as a result of gaming addiction: physical pain in his hands, elbow, and shoulders; increased weight and morbid obesity; diminished social interactions; a drop in his grades and inability to attend school; depression; a lack of interest in

38

other sports/hobbies; a loss and/or lack of friends at school when able to attend; withdrawal symptoms such as rage, anger, and physical outbursts; loss of friends; and other emotional distress, mental anguish, pain and suffering.

233.    As a result, G.D. has undergone out-patient counseling, medication therapy, and has an individualized educational plan ("IEP").

234.    Due to worsening symptoms of lack of impulse control and inability to learn in a traditional classroom setting, and, in part, because of the aforementioned harm to G.D. caused by Defendants' gaming products, G.D. is now homeschooled.

235.    Despite parental efforts to limit game time, G.D. plays video games 12-14 hours per day.

236.    G.D.'s mother, Casey Dunn, has lost hope in her ability to control G.D.'s game playing time and fears G.D. when she attempts to take games away.

237.    G.D.'s father, Thomas Dunn, is only able to interact with his son by playing video games with him.

238.    G.D. has lost interest in all social and physical activities leading to their current weight of 300 pounds.

239.    He plays games with and on his Xbox Game Pass Ultimate subscription, and also plays games on Xbox Series X, their Android mobile phone, and Nintendo Switch.

240.    G.D. has frequent bouts of gamers' rage where he throws game controllers and breaks them.

241.    G.D. is spending approximately $350 per month on gaming.

242.    G.D. has spent approximately $3,000 on in-game transactions and downloadable content. These funds do not include the costs spent on Xbox Game Pass Ultimate, gaming consoles, and copies of games.

243.    As a result of G.D.'s gaming addiction, which was proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, Casey and Thomas Dunn have experienced loss of society and companionship---and have been financially damaged due to G.D.'s uncontrollable in-game spending.

**K. Defendants' Conduct Specifically Led to Plaintiffs' Damages**

244.    Each Defendant is aware that its video games are harmful to minors and young adults because Defendants specifically designed their games to addict.

245.    To this avail, each Defendant employs behavioral psychologists and/or neuroscientists in order to develop games that will best utilize psychological tactics to keep players engaged for longer periods of time.

246.    Due to the psychological aspects of the games, many of Defendant's products have been banned in other countries to avoid the harm to children Defendants are causing daily in the United States.

247.    No bans are in place here, and Defendants continue their pattern of addicting and harming our Nation's youth, young adults, and their families, including the Dunns.

**L. Defendants' Products Used by G.D.**

**<u>Fortnite</u>**

248.    Fortnite, developed and published by Epic Games, was first released in 2017 and is now available in three distinct game mode versions that otherwise share the same general gameplay and game engine.

249.    Fortnite: Battle Royale is a free-to-play battle royale game in which up to 100 players fight to be the last person standing. Players can play alone, in a duo, or in a "squad" of 3-4 players. When players land in the game, they must scavenge for weapons, items, resources, and vehicles while trying to stay alive and attack and eliminate other players.

250.    Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four players fight off zombie-like creatures and defend objects with traps and fortifications they can build. From missions, players are awarded a number of in-game items, which include hero characters, weapon and trap schematics, and survivors, all of which can be leveled up through gained experience to improve their attributes.

251.    Fortnite Creative is a sandbox game mode in which players are given complete freedom to create worlds by spawning any item from Battle Royale on a personal island and can create games such as battle arenas, race courses, platforming challenges, and more.

252.    Each game mode has similar graphics, art assets, and game mechanics.

253.    Battle Royale and Save the World are rated T for Teen—*i.e.,* recommended for individuals aged 13 and above. However, this does not mean younger children are not playing the game.

254.    Epic Games is currently working with the International Age Rating Commission ("IARC") to rate all islands and other content published through the Creative mode.

255.    Save the World is the only pay-to-play game mode of the Fortnite franchise.

256.    And while Fortnite can be played through Microsoft's Xbox Cloud Gaming, no subscription to Microsoft's Xbox Game Pass is required to play Fortnite. The games are free through the Xbox Cloud Gaming service:

41

**YOU DO NOT NEED AN XBOX GAME PASS PAID SUBSCRIPTION TO PLAY FORTNITE THROUGH XBOX CLOUD GAMING. ALL YOU NEED IS A FREE MICROSOFT ACCOUNT, HIGH-SPEED INTERNET CONNECTION, AND COMPATIBLE DEVICE. ONCE YOU'RE READY, GO TO XBOX.COM/PLAY TO START PLAYING WITH MOBILE TOUCH CONTROLS OR A SUPPORTED CONTROLLER. SEE OUR FAQ BELOW FOR MORE DETAILS.** [7]

257.    Fortnite is also available for free on multiple other platforms, including Epic Games, Steam, and PlayStation.

258.    Fortnite games are monetized through the use of V-Bucks: in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.

259.    V-Bucks in Save the World can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items.

260.    V-Bucks in Battle Royale can be used to buy cosmetic items like character models or the game's battle pass: a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a Battle Royale season.

261.    Fortnite has an average of 239 million monthly players and a peak of 15 million players in a day.

---

[7] https://www.fortnite.com/mobile/xbox-cloud-gaming

262.    Less than two years after Fortnite's release in 2017, the games had generated over $9 billion in revenue through microtransactions and in-game purchases. In 2021 alone, Fortnite generated $5.8 billion in revenue.

263.    The addictive properties of Fortnite are so dangerous on young minds that several health and behavioral centers across the country have published resources for parents specifically warning about Fortnite addiction.

264.    Several studies have concluded that Fortnite is "more addictive than heroin and other illegal drugs."

265.    Despite these third-party express warnings of the dangers of Fortnite, Epic Games has failed to disclose the risks of harm purposefully built into its game.

266.    Fortnite gained immense popularity because of its clever manipulation of human psychology. Epic Games developed Fortnite games to make sure that the players keep coming back and playing Fortnite.

267.    The team that developed Fortnite included psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop a game that was as addictive as possible.

268.    One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. Essentially, when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what stopped them from winning was the smallest mistake. As a result, players want to play another match over and over again.

269.    The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a match to feel the high of a win. Such strategy lies in

getting users close to the feeling of winning, because when they are that close, they feel the same buzz and go on to play more rounds. On the other hand, when they do win a round, they win a lot of perks, giving them a spurt of dopamine and the adrenaline rush to play again.

270.    In the hopes of increasing their rank in the game through wins, players continue to play without any pause or rest.

271.    Fortnite also uses random reward tactics—known in psychology as the "variable interval schedule"—the idea that randomized small wins will continue to draw in users.

272.    With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

273.    Additionally, the design of Fortnite keeps players drawn in. The bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale games.

274.    Similarly, the mechanics of the game inject elements of variety, allowing players to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more. In designing such mechanics, Epic Games ensures that players never once get bored while playing.

275.    To keep players even more engaged, Epic Games often rolls out updates that keep players busy with engaging and fresh features, new maps, live events, and the latest trends. Such updates can also remove minor glitches that may be bothering the players as well.

276.    Fortnite also keeps players coming back daily by giving "Daily Quest" assignments that players can complete to earn V-bucks:



277.    Players will thus continually log into the game to complete these quests and earn V-bucks for in-game spending.

278.    These features, combined with the ease of accessibility—the game is free to play on multiple platforms and devices—fosters addiction in minors and young adults because it draws players in and allows them to play nearly anywhere at any time.

279.    Upon information and belief, Epic Games has also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Fortnite games.

280.    Epic Games does not disclose any of the psychological tactics or addictive features it purposefully includes in Fortnite to any of its users.

281.    Instead, Epic Games touts its game as "educational" and markets it for use in the classroom.

---

[8] https://fortnite.fandom.com/wiki/Quests_(Battle_Royale).

282.    On its website, Epic Games even offers "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:



283.    Engaging—and addicting—children early and in environments such as their classroom serves only to increase Epic Games's revenue through continued play of young users, at the expense of these users' mental and physical health.

284.    Epic Games does not adequately inform users of the inherent risks involved with using and playing Fortnite or that the game was designed to addict and harm users.

**Call of Duty**

285.    Call of Duty is a first-person shooter game series that simulates infantry and combined arms warfare.

---

[9] https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative

286.    Call of Duty releases annual versions of the game; currently there are 22 mainline Call of Duty versions.

287.    Call of Duty is the most successful video game franchise created in the United States, and the fourth best-selling video game franchise of all time.

288.    As of April 2021, the series has sold over 400 million copies.

289.    Each iteration of Call of Duty is largely similar, but each has different stories, guns, and abilities.

290.    Activision is the publisher for each Call of Duty version.[10]

291.    Infinity Ward is the developer of Call of Duty games from 2003 to the present.

292.    Treyarch is the developer of Call of Duty games from 2005 to the present.

293.    Sledgehammer Games is the developer of Call of Duty games from 2011 to the present.

294.    Call of Duty offers both single-player and multiplayer modes.

295.    While there are several multiplayer shooter games on the market, Call of Duty remains most popular because of its specific, addictive features.

296.    For instance, Call of Duty involves unlock progression, wherein each kill, assist, or win all seep into a feedback loop that unlocks new equipment as players progress.

297.    Each gun used gets better the more a player uses it, with new attachments becoming available with more points scored.

298.    At the outset, Call of Duty is harmful to youth because those who frequently play violent video games such as Call of Duty show neural desensitization to painful images.

---

[10] Raven Software Corporation is also the developer of Call of Duty games from 2016 to the present, but Raven Software Corporation is wholly part of Defendant Activision.

299.    The rewards in the Call of Duty games are immediate and constitute a constant stream of progression.

300.    It takes a significant amount of time for players to unlock everything, but once they reach the top and everything is unlocked, they have the option to reset it all.

301.    This constant stream of rewards allows players to feel they are making constant progress toward unlocking everything in the whole game—a form of operant conditioning.

302.    With operant conditioning, players are reinforced to enact the correct behavior: in this case, making "kills" to earn extra game content.

303.    Combining these addictive feedback loops with fast-paced play, satisfying graphics, sounds, and other dopamine lifts make the Call of Duty franchise extremely addicting to players.

304.    Activision, Infinity Ward, Treyarch, Sledgehammer Games, and Raven Software (collectively the "Call of Duty Defendants") were aware that the Call of Duty games included significant psychological aspects to encourage continuous game play and eventually lead to the addiction of its plays—especially minors.

305.    In fact, upon information and belief, the Call of Duty Defendants specifically designed the Call of Duty games in concert with psychologists and neuroscientists to discover the best addictive aspects to include in their games.

306.    Several of these addictive technological features have even been patented by Activision.

307.    Upon information and belief, the Call of Duty Defendants have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Call of Duty games.

48

308.    The Call of Duty Defendants also utilize several schemes to increase game time, consequently increasing in-game spending on downloadable content and microtransactions.

309.    Several of the Call of Duty versions include loot box schemes, and others include "battle passes" which allow users to unlock additional tiers of game play for a certain price:

> If you've already experienced the full version of *Call of Duty®: Black Ops Cold War* or *Modern Warfare®*, you are probably familiar with the Battle Pass system. For those that aren't, here's how it works:
>
> The Battle Pass has 100 tiers of content for you to progress through and earn once you've purchased the Battle Pass.
>
> To advance through these tiers, you simply play the game (either *Warzone, Black Ops Cold War*, or *Modern Warfare*). The longer you play, the more Tier progress you get. Sometimes, there are events where Double Tier progress can be gained, and it does exactly what you'd expect; double the rate at which you get Battle Pass Tiers through time played.
>
> Through the Battle Pass system, everyone can unlock and enjoy tiers of free content, and all functional content that has an impact on game balance, including base weapons and attachments, can be unlocked simply by playing the game.
>
> So, to recap: you play the game, you get Battle Pass Progress which unlocks Tiers, and then you get rewards from Tiers. Yes, it's that simple. [11]

310.    While users can play 20 of the 100 levels for free, to continue gameplay through additional "tiers," a user has to pay 1,000 "Call of Duty Points" which equates to $9.99 in real-world funds.

---

[11] https://www.callofduty.com/content/atvi/callofduty/warzone/web/fr_ca/strategyguide/pre-game-preparation/wz-battle-pass.html

49

**Free Tiers (of the Battle Pass system):** Everyone can earn over 20 free tiers of content, including two functional weapons just by playing.

**Wartracks:** Among the rewards that can be earned at specific Free Tiers are Wartracks, packs of popular songs from the *Call of Duty* universe and in the real world! Equip a track to a specific vehicle in the Vehicle Customization menu (like Battle Horns), then as soon you hop in, the music gets turned up. Your entire squad can listen to the beat while you drive, and let the song guide you to your primary objective – survival.

**Battle Pass:** Players looking for the ultimate customization can purchase the Battle Pass for 1,000 *Call of Duty®* Points and get access to unlock up to 100 tiers of content. These Tiers include scores of Rare, Epic, Legendary, and occasionally Ultra weapon blueprints, Operator skins, Operator Missions, and more, including a new Operator at Tier 0 in most, if not all, seasons.

**Dual Reward Tiers:** Some tiers within the Battle Pass include two rewards: one for *Black Ops Cold War* and one for *Warzone*. These are marked within the Battle Pass, offering those who own *Black Ops Cold War* with their own special item in addition to one they can use in *Warzone*.

**Battle Pass Bundle:** Purchase the Battle Pass Bundle and get access to everything you get with the Battle Pass, plus 20 Tier skips which grant instant access to your next 20 tiers of content.

**Tier Skips:** Buy individual Tier skips for 150 COD Points.

You can purchase at any time without missing any content. If you choose to purchase the Battle Pass after already ranking up a few tiers, no problem: You'll immediately be awarded everything from the Tiers you have already unlocked through gameplay.    [12]

311.    Though the Call of Duty Defendants know of the addictive features and technology included in their games, they do not inform their users of the risks inherent with playing this game.

312.    Activision touts the game as a "heart-racing saga" with "unrivaled intensity," "breathtaking covert operations," "an immersive narrative," and "the ultimate online playground."[13]

313.    The Call of Duty Defendants do not adequately inform users of the inherent risks involved with using and playing Call of Duty or that the game was designed to addict and harm users.

**Rainbow Six**

314.    Tom Clancy's Rainbow Six is an online tactical shooter video game developed by Ubisoft Montreal and published by Ubisoft (collectively the "Rainbow Six Defendants").

---

[12] https://www.callofduty.com/content/atvi/callofduty/warzone/web/fr_ca/strategyguide/pre-game-preparation/wz-battle-pass.html

[13] https://www.activision.com/games/call-of-duty/call-of-duty-modern-warfare

315.   The game is based on the novel Rainbow Six by author Tom Clancy and was first released in 1998 for PC.

316.   The series today consists of over 20 separate games, in which players travel around the world hunting down terrorists as part of a global anti-terrorist unit.

317.   Ubisoft confirms that, as of 2021, the Rainbow Six Siege version of the series had over 70 million registered players across platforms.

318.   In Ubisoft's 2021-2022 investor report, it stated that the Rainbow Six game series generated €300 million, or nearly $317 million, throughout the year across licensing agreements and raw sales.

319.   In the popular Rainbow Six Siege game, released in 2015, Ubisoft included microtransaction models in the game.

320.   While the maps and game modes continue to be available for free, new characters and weapon skins require in-game currency known as "Renown" to purchase.

321.   Players can accumulate Renown by playing the game but can also purchase Renown with real-world funds.

322.   "R6 Credits" are another in-game currency that can be purchased with real money to obtain premium weapon skins in the game.

323.   Unlike Renown, R6 Credits cannot be obtained through other means within the game.

324.   Credit packs are available in varying amounts at varying costs; 600 credits cost $4.99, 1,200 credits cost $9.99, 2,400 credits cost $19.99, 4,200 credits cost $34.99, 6,000 credits cost $49.99, and 12,000 credits cost $99.99.

325.    The first credit pack of 600 credits is essentially enough to purchase one seasonal operator or an epic weapon skin within the game.

326.    Elite skin bundles in the game cost 1,800 R6 Credits, and conveniently, there are no credit bundle packs for 1,800 credits—meaning a user would have to purchase a 2,400-credit pack to purchase an elite skin bundle in the game.

327.    Thus, the credit bonuses that one can get by buying expensive currency packs incentivizes people to buy more in order to obtain more downloadable content within the game.

328.    The Rainbow Six Defendants intentionally developed the game with addictive psychological features to keep users playing more often and for longer periods of time.

329.    Upon information and belief, the Rainbow Six Defendants have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Rainbow Six games.

330.    Specifically, the game is set up such that no two game-play sessions are the same; within the game there are multiple map entry points and places for players to explore that the game is constantly changing and a different experience for players every time.

331.    Such constant variety keeps players hooked and coming back daily and playing for hours.

332.    Moreover, the amount of time it takes to "level up" within the game increases significantly over time, causing players to spend more and more hours to achieve the same experience of "leveling up."

333.    Players are also afforded only one life per round, making players pay closer attention to the game in each match, use significant mental capacity in an effort to try and win, and frustrate players all the more with each loss.

52

334.   Though they are equipped with the knowledge of the addictive risks inherent in their game, the Rainbow Six Defendants have failed to inform the public, users, or parents of such risks.

335.   The Rainbow Six Defendants know that many users—like Plaintiff—play in excess, but rather than discourage such play, the Rainbow Six Defendants profit off their continued game time and spending.

336.   The Rainbow Six Defendants do not adequately inform users of the inherent risks involved with using and playing Rainbow Six or that the game was designed to addict and harm users.

**Battlefield**

337.   Battlefield is a series of first-person shooter video games developed by DICE and published by EA (the "Battlefield Defendants").

338.   Battlefield was first released in 2002 and the series is now comprised of multiple separate games.

339.   The series features a particular focus on large maps, teamwork, and combined arms warfare. Generally, the games feature large-scale, online multiplayer battles.

340.   The Battlefield series averages thousands of players per day and has sold 88.7 million copies across all of its games.

341.   The Battlefield Defendants intentionally created and developed the Battlefield series with psychologically addictive features and tactics to ensure players would keep coming back to the game, playing longer, and spending more in in-game purchases within the game.

342.    The Battlefield games promote player engagement—and addiction—by including tactics such as player ranking, determined by the amount of Experience Points or "XP" accumulated by the player.

343.    XP is earned by playing matches, so the more a player plays, the more they rank up.

344.    Ranks range from #0 (Private, from 0-999 XP) up to #150 (Five-Star General, 50,000,000 XP). The trick, however, is that rank progression is not linear. As a player approaches higher ranks, they are required to obtain more and more points to reach the next level.

345.    Thus, for newcomers, it is really easy to progress—keeping them motivated and happy by ranking up quickly. But as users get more addicted to the game, they also need to invest considerably more time to advance, creating a harmful cycle for users.

346.    The series centrally records online statistics for each player, allowing users to receive rank promotions and weapon unlocks based on their performance.

347.    Battlefield also employs daily and weekly challenges to be completed for players to get a reward:



348.    Daily and weekly challenges help create a habit in users, as they encourage them to continually log in daily and play for at least some period of time.

349.    The Battlefield games also employ special campaigns that provide specific tasks or assignments for special rewards within the game. Players thus play longer trying to complete these special challenges as they are designed to seem limited and often involve exclusive rewards.

350.    Upon information and belief, the Battlefield Defendants have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Battlefield games.

351.    Users are also encouraged to purchase in-game content, including battle packs and battle passes that unlock additional content.

---

[14] https://medium.com/@andrefre/5-ways-battlefield-1-hooks-the-players-72bbf27c05a1

352.    To expand the game beyond the "free" path containing a set number of unlockable items, users are required to upgrade to a "premium" path with exponentially more progression opportunities, weapons, and other game content.

353.    The more a player wants to advance in the game, the more they will have to spend to do so.

354.    Though they are equipped with the knowledge of the addictive risks inherent in their game, the Battlefield Defendants have failed to inform the public, users, or parents of such risks.

355.    The Battlefield Defendants know that many users—like G.D.—play in excess, but rather than discourage such play, the Battlefield Defendants profit off their continued game time and spending.

356.    The Battlefield Defendants do not adequately inform users of the inherent risks involved with using and playing Battlefield or that the game was designed to addict and harm users.

**Xbox Game Pass Cloud Gaming**

357.    Xbox Cloud Gaming is Microsoft's Xbox cloud gaming service.

358.    Xbox Cloud Gaming was initially released in beta testing in November of 2019. The service was later launched for subscribers of Xbox Game Pass Ultimate on September 15, 2020.

359.    Xbox Cloud Gaming is available to all members of Xbox Game Pass Ultimate, which is an ongoing $17 per month subscription.

360.    Xbox Cloud Gaming operates by linking the device to a remote server in the cloud.

361.    Gameplay is saved in the cloud and can be accessed and played from numerous devices at any given location.

362.    In fact, Xbox Cloud Gaming allows for gameplay from a number of devices—no longer is a console required. Games can be accessed instead from the content library of Xbox Cloud Gaming includes thousands of games spanning every game rating category:



363.    This means that anyone with an Xbox Cloud Gaming account can access and play any game on the platform.

364.    Games can be played on computers, consoles, or mobile devices.

365.    The games in the Xbox Cloud Gaming library are not only extensive but is everchanging. This keeps players coming back to either finish a game before it disappears or check for new and exciting game options to play:

---

[15] https://www.xbox.com/en-US/browse/games



16

366. Xbox Game Pass Ultimate (the subscription plan that includes Xbox Cloud Gaming) also offers users daily, weekly, and monthly "quests" that can be completed for varying amounts of Microsoft Reward points:

---

[16] https://www.xbox.com/en-us/games?xr=shellnav

# How it works

Xbox Game Pass Ultimate and Console plan members can earn Microsoft Rewards points by playing games from the Xbox Game Pass library. Here's how to get started.

## 1.

### Browse current Quests

Check out current Quests on your Xbox console in the Xbox Game Pass section or on your Xbox Game Pass mobile app. New Quests are added every day.

## 2.

### Participate in Quests

Find the list of Quests in the Xbox Game Pass membership area on your Xbox console or on the Xbox Game Pass mobile app. You will receive an instant notification when your Quest is ready to be turned in.

## 3.

### Claim and track your points

Go to the Xbox Game Pass area on your Xbox console or on your Xbox Game Pass mobile app to claim and track your points.

## 4.

### Redeem points

Head to the Microsoft Rewards app to spend your points! Redeem points for Xbox gift cards and use for in-game content, games, devices, movies, apps accessories and more.

[17]

367.    The ease of access, quest challenges, and constantly evolving game library draws players in, and keeps them coming back.

368.    In fact, Microsoft CEO announced that over 20 million people have streamed video games using Xbox Cloud Gaming.

369.    Xbox Cloud Gaming allows these users to connect with each other within the platform, by including a feature to add and interact with friends, called "Xbox Social."

---

[17] https://www.xbox.com/en-US/xbox-game-pass/quests

370.    This social media-esque feature permits users to add friends to a Friends list and then see what games your friends are playing and/or invite them to join your game:



371.    Moreover, users can chat with each other individually or in groups.

372.    To find friends, users are encouraged to link to other social media accounts with their Xbox subscription.

---

[18] https://support.xbox.com/en-US/help/friends-social-activity/share-socialize/use-xbox-game-bar-to-play-and-chat-with-friends

373.    Minors and young adults are therefore encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

374.    Microsoft does not adequately inform users of the inherent risks involved with using its platforms or that the platforms—along with the games being played thereon---were designed to addict and harm users.

**L.  Minors' Access to Defendants' Products**

375.    In order to use any of Defendants' respective products, a user must first obtain access to the product.

376.    G.D. played Call of Duty, Fortnite, Battlefield, and Rainbow Six on his Xbox Series X, through Xbox Game Pass Ultimate, and other games downloaded through Google Play on his Android mobile phone.

377.    To sign up to play the Defendants' games through the Xbox Game Pass, a user must first create an account. A new account can be created by entering an email address, creating a password, and adding a name.

378.    A prospective user is then invited to press the button to create the account; however, in very small print below this button, the user is informed that signing up means the user agrees to the platform's terms and conditions. The text of such policies is not presented on the sign-up page. The user is not informed that they can or should click on the terms or otherwise told to first review them.

379.    G.D.—as a minor—lacked the capacity to contract, and thus expressly disaffirms any contract they may have made with any of the Defendants, or that Defendants may claim they made with Plaintiff before reaching the age of majority.

380.   G.D.'s continued use of Defendants' products was thereafter compulsive and due to addiction and in no way was an affirmation of any contract.

381.   Each Defendant's terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to signing between the parties. Accordingly, any terms to which Plaintiffs agreed prior to utilizing each Defendant's product, or while using such product, are void and unenforceable.

382.   Likewise, Defendants' products were designed to addict G.D. to the products, which caused a slew of mental and physical health issues to G.D. Defendants' terms and conditions and any other purported contracts are therefore void as against public policy as an individual cannot consent to harming a child.

## V.   **TOLLING OF STATUTE OF LIMITATIONS**

383.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

384.   Through the exercise of reasonable diligence, Plaintiffs could not have discovered that Defendants' products caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiffs.

385.   Plaintiffs did not suspect and had no reason to suspect Defendants' products caused their injuries until within the last year.

386.   Due to the highly technical nature of the Defendants' products, Plaintiffs were unable to independently discover that Defendants' products caused their injuries until within the last year.

387. Defendants had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

388. Defendants' fraudulent concealment has tolled the running of any statute of limitations.

389. Defendants had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially children and teens.

390. Defendants knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of their products and that these products caused their injuries.

391. Defendants' tortious and fraudulent acts continue to this day; as of the date of this Complaint, Defendants have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

392. Despite their knowledge of the defects and their attendant safety risks, Defendants continue to market their products to children and teens—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

393. G.D. was unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

394. Casey and Thomas Dunn were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

63

395.    For the foregoing reasons, Defendants are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

## VI.    CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY – DESIGN DEFECT
### (Against all Defendants)

396.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

397.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

398.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

399.    Each of the Defendant's respective products are marketed and advertised to minors and young adults.

400.    Each Defendant defectively designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products. More specifically:

        a.  Epic Games designed Fortnite to be as addictive as possible and includes numerous psychological tricks to ensnare users, including but not limited to a

"near miss" effect, random rewards, bright and vibrate colors, and continual gameplay variety;

b.  Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, including but not limited to feedback loops, fast-paced play, and dopamine lifts from satisfying graphics and sounds;

c.   Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, including but not limited to constantly changing game-play sessions and increasing difficulty to move up levels within the game;

d.  DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, including but not limited to increasing difficulty to move up levels within the game, daily and weekly challenges, and special event campaigns; and

e.  Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features that include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users.

401.   The defects in the design of each of the Defendant's respective products existed prior to the release of these products to G.D. and the public, and there was no substantial change

to any of the Defendants' products between the time of their manufacture (in regards to consoles or physical game copies) and the time of their distribution to G.D. via download or URL access (in regards to digital game copies and cloud gaming).

402.    G.D. used these products as intended, and each Defendant knew or, by the exercise of reasonable care, should have known that Plaintiff would use these products without inspection for their addictive nature.

403.    Each Defendant defectively designed its respective products to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, compulsive use, and additional mental and physical harm. More specifically:

> a. Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;
>
> b. Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;
>
> c. Ubisoft Montreal and Ubisoft designed the Rainbow Six games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;
>
> d. DICE and EA designed the Battlefield games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users; and

e. Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users.

404.    Each of the Defendant's respective products are defective in design and unreasonably dangerous for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

405.    Youth, like G.D., and young adults are among the ordinary consumers of each of the Defendant's products. Pre-teen and young consumers, and their parents and guardians, do not expect: (a) Defendants' products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each of the Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable content and/or microtransactions.

406.    Each of the Defendant's respective products are likewise defectively designed such that it creates an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

67

407.    Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including G.D., who used the products without any substantial change in the products' condition.

408.    The risks inherent in the design of each of the Defendant's respective products significantly outweigh any benefit of such design.

409.    Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

    a.  Choosing not to use "addictive" patents identified herein in the game design;

    b.  Redesigning gaming software to limit rather than promote addictive engagement;

    c.  Implementing robust age verification;

    d.  Implementing effective parental controls;

    e.  Implementing effective parental notifications;

    f.  Warning of health effects of use and extended use upon sign-up or log-in;

    g.  Implementing default protective limits to the length and frequency of gaming sessions;

    h.  Implementing opt-in restrictions to the length and frequency of gaming sessions;

    i.  Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports;

j.  Implementing blocks to use during certain times of day (such as during school hours or late at night);

k.  Implementing limits on number of games playable per day;

l.  Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer;

m.  Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and overall in-game spending per day;

n.  Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and

o.  Others as set forth herein.

410.  Alternative designs were available that would reduce minors' addictive and compulsive engagement with each of the Defendant's respective products, and which would have effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

411.  G.D. used Defendants' products as intended or in reasonably foreseeable ways.

412.  As a direct and proximate result of their use of Defendants' defectively designed products, G.D. sustained physical and mental injuries, emotional distress, pain and suffering, mental anguish, and economic injuries and damages.

413.  G.D.'s injuries and damages were reasonably foreseeable to each of the Defendants at the time of their respective products' development, design, advertising, marketing, promotion, and distribution.

414.    The defective design of the products used by G.D. was a substantial factor in causing harm to G.D.

415.    As a direct and proximate result of Defendants' respective products' defective design, G.D. suffered serious injuries, including mental health diagnoses, physical pain in his hands, elbow, and shoulders, diminished social interactions, a drop in his grades and inability to attend school, depression, a lack of interest in other sports/hobbies, a loss and/or lack of friends at school, withdrawal symptoms such as rage, anger, and physical outbursts, pain and suffering, mental anguish, and emotional distress.

416.    G.D. was injured as a direct and proximate result of each of the Defendant's respective defective designs, as described herein, and Plaintiffs suffered economic damages as a result thereof.

417.    The defective design of Defendants' respective products, as identified and described herein, is a proximate cause of the harm and injuries to G.D. Plaintiffs' damages proximately caused by Defendants' defective design are G.D.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; G.D.'s inability to attend school; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical  care, treatment, and service (including transportation, lodging, and board) expenses related to G.D.'s physical and mental injuries. G.D.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

418.    Defendants are strictly liable due to the defective design of their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

419.    The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

420.    The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, G.D. continues to use Defendants' respective products. While G.D. uses Defendants' respective products, they will not be able to independently verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

421.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT II
## STRICT LIABILITY – FAILURE TO WARN
### (Against All Defendants)

422.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

423.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video

game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

424.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

425.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

426.    None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

427.    Each of the Defendants sold and distributed its respective products to G.D. in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

428.    Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement, and compulsive use.

429.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution.

72

430.     Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

a.  Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries;

b.  Defendants' respective products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries;

c.  The feedback loops and strategized patented material in Defendants' respective products are designed to promote increasingly stimulative and alarming content to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction;

d.  New users of Defendants' respective products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

e.  The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and

f.  The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

431.    Ordinary users would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each of the Defendants.

432.    Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using Defendants' respective products, Plaintiffs would have heeded the warnings and/or instructions.

433.    Each Defendant's failure to adequately warn Plaintiffs about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

434.    As a direct and proximate result of each Defendant's failure to warn, G.D. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

435.    Defendants are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

436.    The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

437.    The nature of the fraudulent and unlawful acts that created safety concerns for G.D. are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, G.D. continues to use Defendants' respective products. When G.D. uses Defendants' respective products, they will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

438.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT III
## NEGLIGENCE – DESIGN
### (Against All Defendants)

439.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

440.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

441.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

442.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

443.    Each Defendant knew or, by the exercise of reasonable care, should have known, that its respective products were dangerous, harmful, and injurious when used by youth in a reasonably foreseeable manner. More specifically:

75

a.   Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b.   Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.   Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.   DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

e.  Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

444.  Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to G.D.

445.  Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' respective products. Those risks include abuse, addiction, and compulsive use in youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

446.  Each Defendant knew that minors such as G.D. would use its respective products.

447.   G.D. was a foreseeable user of the Defendants' respective products.

448.  Each Defendant had a duty to use ordinary care in its design and to package the product in order to protect those who will use it and who are in the area of its use from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

77

449.     Each Defendant owed this duty to use ordinary care in designing a safe product to users, like G.D.

450.     Each Defendant breached this duty. These breaches include, but are not limited to:

    a.   Utilizing patented designs and technology for purposes of addicting users to the Defendant's respective products;

    b.   Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to youth, who are particularly unable to appreciate the risks posed by the products;

    c.   Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

    d.   Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    e.   Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and

f.   Otherwise failing to use ordinary care in its design and packaging in order to protect those who will use it and who are in the area of its use from unreasonable risk of harm while using the product as intended.

451.   Alternative designs that would reduce the addictive features of Defendants' respective products were available, would have served effectively the same purpose as each of the Defendant's defectively designed products, and would have reduced the gravity and severity of danger Defendants' respective products posed minors such as G.D..

452.   A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

453.   At all relevant times, G.D. used Defendants' respective products in the manner in which they were intended by Defendants to be used. As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs were harmed. Defendants' design of their respective products was a substantial factor in causing the Plaintiffs' harm and injuries, as described herein.

454.   As a direct and proximate result of each of the Defendant's breached duties, G.D. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

455.   As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs have suffered—and continued to suffer—economic loss and damages, as described herein.

456.   Defendants negligently designed their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

**COUNT IV**
**NEGLIGENCE – FAILURE TO WARN**
**(Against All Defendants)**

457.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

458.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

459.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

460.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

461.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

> a. Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;
>
> b. Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, while knowing that abuse,

80

addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

e. Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

462.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products

at the time of the products' development, design, marketing, promotion, advertising, and distribution to G.D.

463.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as G.D. would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

464.    Each Defendant knew that minors such as G.D. would use its respective products.

465.    None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

466.    Had Plaintiffs received proper or adequate warnings about the risks of Defendants' respective products, Plaintiffs would have heeded such warnings.

467.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

468.    Each Defendant owed this duty to users like G.D.

469.    Each Defendant breached this duty owed to G.D., a foreseeable user. These breaches include, but are not limited to:

    a. Failing to warn users that Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries; and

82

   b. Failing to otherwise provide reasonable and adequate warnings to Plaintiffs, as

   set forth above, about the dangers inherent or reasonably foreseeable posed by

   the use of each Defendant's product.

470.    A reasonable company under the same or similar circumstances as Defendants

would have used reasonable care to provide adequate warnings to consumers, including the parents

of minor users, as described herein.

471.    At all relevant times, each Defendant could have provided adequate warnings to

prevent the harm and injuries described herein.

472.    Had Plaintiffs received proper or adequate instructions regarding the risks of

Defendants' respective products and the need to alter their game play to avoid such risks, G.D. and

his parents would have heeded such warnings.

473.    As a direct and proximate result of each Defendant's breach of its respective duty

to provide adequate warnings, Plaintiffs were harmed and sustained the injuries set forth herein.

Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in

causing harm to Plaintiffs.

474.    Each Defendant negligently failed to warn consumers, including Plaintiffs, of the

risks, dangers, and harm posed by their respective gaming products, as identified herein, and

Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries,

loss, and harm described herein.

**COUNT V**
**NEGLIGENCE – FAILURE TO INSTRUCT**
**(Against All Defendants)**
**(Pleaded in the Alternative)**

475.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as

though set forth fully herein.

476.    Plaintiffs plead this Count in the alternative.

477.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

478.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

479.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

480.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

> a.  Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

> b.  Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

84

c. Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

e. Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

481.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to G.D.

85

482.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

483.    Each Defendant had a duty to give reasonable and adequate instructions with respect to the conditions and methods of its safe use when danger is reasonably foreseeable in its use, unless the danger is known to the user or is reasonably discoverable by them.

484.    Each Defendant breached its duty by failing to provide reasonable and adequate instructions to G.D., a foreseeable user. More specifically, Defendants did not give any instructions with respect to the addictive conditions of their respective products or on methods of its safe use to avoid the risks and harm built into each Defendants' respective gaming products...

485.    A reasonable company under the same or similar circumstances as Defendants would have used provided adequate instructions to consumers, including minor users and parents like Plaintiffs.

486.    At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

487.    Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, G.D. and his parents would have followed such instructions.

488.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate instructions, Plaintiffs were harmed and sustained the injuries set forth herein.

86

Each Defendant's failure to provide adequate and sufficient instructions was a substantial factor in causing harm to Plaintiffs.

489.    As a direct and proximate result of each Defendant's failure to instruct, G.D. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

490.    Plaintiffs have also incurred economic losses, in the tune of thousands of dollars spent by G.D. while using Defendants' products that they would not have incurred but for the addictive and harmful propensities of Defendants' gaming products.

491.    Each Defendant negligently failed to instruct consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

### COUNT VI
### NEGLIGENCE
### (Against All Defendants)

492.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

493.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D. – Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming. Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

494.     Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

495.     Each Defendant owed G.D. a duty to act as a reasonably careful company would under the circumstances.

496.     A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

497.     A reasonably careful company would protect G.D. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

498.     A reasonably careful company would not invite, encourage, or facilitate youth, such as G.D., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did not just that.

499.     A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant did just that. More specifically:

   a.   Epic Games failed to disclose that it designed the Fortnite games with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products posed significant risk of harm;

   b.   Activision, Infinity Ward, Treyarch, and Sledgehammer Games failed to disclose that they designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by foreseeable users,

*i.e.*, minors, can lead to injury and, as such, the products posed significant risk of harm;

c. Ubisoft Montreal and Ubisoft failed to disclose they designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products posed significant risk of harm;

d. DICE and EA failed to disclose they designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products posed significant risk of harm; and

e. Microsoft failed to disclose that it designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.,* minors, can lead to injury and, as such, the products posed significant risk of harm.

500.    G.D. was a foreseeable user of the Defendants' respective products.

501.    Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of G.D.'s use of Defendants' respective products.

502.    Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth such as G.D. in a reasonably foreseeable manner. More specifically:

a. Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b. Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

e.  Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

503.  At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth such as G.D., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

504.  Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, such as G.D., would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

505.  Each Defendant's conduct was closely connected to G.D.'s injuries and Plaintiffs' damages, which were highly certain to occur.

506.  Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed G.D.

91

507.    Each Defendant also owes a particularly heightened duty of care to users under the age of 13 due to the recognized safety risks posed to such users from interactive online products, such as Defendants' respective products. *See* 15 U.S.C. § 6501 *et seq.*

508.    Each Defendant also owes a duty to not to engage in unconscionable acts or practice in business, commerce, or trade. *See* Ark. Code. Ann. § 4-88-101, *et seq.*

509.    Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular game-play in order to avoid such risks.

510.    Each Defendant also owed a duty to consumers not to engage in deceptive or misleading practices in connection with sweepstakes, contests, and prize promotions within their respective products. *See* ARK. CODE ANN. § 4-102-101, *et seq.*

511.    Each Defendant has breached the duties owed to G.D.

512.    Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

        a.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including G.D.;

92

b. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including Plaintiff, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including G.D.;

d. Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users; and

e. Facilitating use of their respective products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

513. Each Defendant has breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a. Failing to implement effective protocols to block users under the age of 13;

b. Failing to implement effective parental controls;

    c.  Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

    d.  Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

    e.  Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

    f.  Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

514.    Each Defendant further breached the duty owed to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

515.    Each Defendant also breached its duty owed under ARK. CODE. ANN. § 4-88-107 *et seq.* not to engage in unconscionable or deceptive business acts or practices.

516.    Each Defendant also breached its duty owed under ARK. CODE. ANN. § 4-102-101 *et seq.* not to mislead or act in a manner contrary to the public policy of the State of Arkansas in connection with prize promotion.

517.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a

manner that is safer for and more protective of youth users like G.D.; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

518.    As a direct and proximate result of each Defendant's breach of one or more of its duties, G.D. has been injured and Plaintiffs were harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

519.    Each Defendant's breach of one or more of its duties is a proximate cause of G.D.'s injuries and the damages sustained by Plaintiffs..

520.    As a direct and proximate result of each of the Defendant's breach of duties, G.D. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

521.    Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

**COUNT VII**
**OUTRAGE**
**(Against All Defendants)**

522.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

523.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video

game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

524.    As described herein, each of the Defendants defectively designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

      a.  Epic Games designed the Fortnite games to be as addictive as possible and include numerous psychological tricks to ensnare users, including but not limited to a "near miss" effect, random rewards, bright and vibrate colors, and continual game-play variety;

      b.  Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, including but not limited to feedback loops, fast-paced play, and dopamine lifts from satisfying graphics and sounds;

      c.  Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, including but not limited to constantly changing game-play sessions and increasing difficulty to move up levels within the game;

      d.  DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, including but not limited to increasing difficulty to move up levels within the game, daily and weekly challenges, and special event campaigns; and

e.   Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features that include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users.

525.   Each Defendant defectively designed its respective products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a.   Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

b.   Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

c.   Ubisoft Montreal and Ubisoft designed the Rainbow Six games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

d.   DICE and EA designed the Battlefield games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users; and

      e.  Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users.

526.    Defendants intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors, like G.D., to use each Defendants' respective product and intended for users, like G.D., to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

527.    Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors and neurodivergent individuals—was extreme and outrageous, is beyond all possible bounds of decency, and utterly intolerable in a civilized community.

528.    Each Defendant should have known users, like G.D., would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so Defendants can continue to profit off of users, including G.D., after initial purchase or download,.

529.    Each Defendant intended to inflict emotional distress *(e.g.*, addiction) on users, like G.D., and should have known users, like G.D., would suffer emotional distress as a result of Defendants' conduct.

530.    Plaintiffs have sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

531.    Such conduct in intentionally creating products to addict and abuse children and cause them severe mental and physical harm is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

532.    No reasonable person would be expected to endure such emotional distress suffered by Plaintiffs as a result of each Defendant's conduct.

533.    As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, G.D. has experienced extreme emotional distress and is required (and will require) additional treatment for his mental health conditions proximately caused by Defendants' outrageous behavior.

534.    As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

535.    Further, each Defendant's outrageous conduct, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount---imposed by the jury at trial---sufficient to punish the Defendants and deter others from like conduct.

## COUNT VIII
## VIOLATION OF DECEPTIVE TRADE PRACTICE ACT
### §§ 4-88-101 *et seq.*
### (Against All Defendants)

536.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

537.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

538.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

539.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

540.    It is unlawful for any Defendant to engage in deceptive and unconscionable trade practices, and such practices are prohibited by the Arkansas Deceptive Trade Practices Act ("ADTPA"), ARK. CODE ANN. § 4-88-101, et seq..

541.    Each Defendant engaged in deceptive and unconscionable trade practices in connection with the sale and advertisements of its gaming product, identified herein. Those violations include but are not limited to the following:

      a.  Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services;

      b.  Advertising the goods or services with the intent not to sell them as advertised;

      c.  Employing bait-and-switch advertising consisting of an attractive but insincere offer to sell a product or service which the seller in truth does not intend or desire to sell;

d. Knowingly taking advantage of consumers who is reasonably unable to protect their interest because of their age;

e. Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

f. Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, like G.D., rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

g. Using false and misleading representations, while omitting and concealing material facts, relating to the safety of each Defendant's respective products, specifically:

    i. Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products posed significant risk of harm;

    ii. Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products posed significant risk of harm;

iii.  Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products posed significant risk of harm;

iv.  DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products posed significant risk of harm; and

v.  Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products posed significant risk of harm;

h.  Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth, specifically:

i.  Epic Games knew that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise

therefrom, but instead of disclosing such harms, instead Epic Games marketed Fortnite as "educational" and for use in the classroom;

ii. Activision, Infinity Ward, Treyarch, and Sledgehammer Games each knew that its Call of Duty games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its games for play by youth;

iii. Ubisoft Montreal and Ubisoft each knew that its Rainbow Six games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its games for play by youth;

iv. DICE and EA each knew that its Battlefield games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its games for play by youth; and

v. Microsoft knew that its Xbox Game Pass Ultimate and Xbox Cloud Gaming platforms contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its platforms for play by youth.

542.   Each Defendant engaged in the aforementioned unconscionable or deceptive trade practices in the in the course of business and in connection with the sale of goods or services to Arkansas consumers, including Plaintiffs.

543.   Each Defendant also violated the ADTPA by offering misleading or deceptive prize promotions, including but not limited to

    a.   Representing directly or by implication that players, including G.D., will have an increased chance of receiving a prize by making multiple or duplicate purchases, payments, or donations, or by entering a game, drawing, sweepstakes, or other contest more than one time, unless the representation is true;

    b.   Representing directly or by implication that users, like G.D., are being notified a second or final time of the opportunity to receive or compete for a prize unless the representation is true; and

    c.   Representing directly or by implication that a prize notice is urgent, or otherwise convey an impression of the urgency by use of description, narrative copy, phrasing on an envelope, or similar method unless there is a limited time period in which the recipient must take some action to claim or be eligible to receive a prize, and the date by which such action is required appears in immediate proximity to each representation of urgency and in the same type size and boldness as each representation of urgency;

    d.   Failing to give the disclosures related to a prize promotion required by ARK. CODE ANN. § 1-102-106; and

    e.   Offering misleading or deceptive prize promotions through its respective games, including but not limited to, timed quests, battle passes or packs, and loot boxes, that encourage users like G.D. to continually keep making in-game purchases.

544.    Each Defendant also violated the ADTPA by failing to provide adequate notice to parents---including Casey and Thomas Dunn---about collecting personal information of children--like G.D.---under the age of 13, as required by the Children's Online Privacy Protection Act and accompanying regulations.

545.    Defendants' actions detailed herein constitute deceptive and unconscionable acts and trade practices in violation of the ADTPA.

546.    Plaintiffs relied to their detriment on each Defendant's deceptive and unconscionable acts, including Defendants' respective misrepresentations and deceptions, in deciding to use Defendants' gaming products.

547.    As a proximate result of each Defendant's deceptive and unconscionable trade practices, described above, Plaintiffs suffered actual financial loss. This loss includes but is not limited to, money spent on microtransactions and expenses Casey and Thomas Dunn have necessarily paid and/or have become liable to pay and will continue to pay and/or be liable to pay for medical aid, medical treatment, and medications of G.D.

548.    Had each Defendant not engaged in the respective unfair, deceptive, and abusive conduct described herein, G.D. would not have used each Defendant's respective products and Plaintiffs would not have suffered financial loss.

549.    Each Defendant violated the ADTPA in the manner described herein and, as a result of Defendants' countless violations of the ADTPA, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for their actual financial loss and reasonable attorney's fees incurred in connection with prosecuting this claim.

550.    Additionally, because Plaintiffs suffered pecuniary loss of more than $500 as a result of each Defendant's intentional, knowing, and willful violation of Arkansas's Prize

Promotion Act, ARK. CODE ANN. § 4-102-101 *et seq.*, Plaintiffs are entitled to recover their costs, reasonable attorneys' fees, and twice the amount of their pecuniary loss.

551.    Each Defendant engaged in unconscionable and deceptive trade practices, as described above, which was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, outrageous, unlawful, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers. This misconduct warrants an award of punitive damages in an amount— imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

### COUNT IX
### DECEIT/FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

552.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

553.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.—Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming. As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

554.    Each Defendant made representations of material facts about their respective products, while knowing or believing those representations to be false *and* with the intent that Plaintiffs (and the public) rely on those misrepresentations.

555.   These false representations involve misstatements about the safety of each Defendant's product identified herein and include, but are not limited to:

   a.   Epic Games misrepresented Fortnite as safe for use by minors and young adults, including G.D., while knowing that abuse, addiction, and compulsive use by youth can lead to injury, and knowing that it had designed and developed Fortnite to be as addictive as possible;

   b.   Activision, Infinity Ward, Treyarch, and Sledgehammer Games misrepresented the Call of Duty games as safe for use by minors and young adults, including G.D., while knowing that it had designed and developed the Call of Duty games with addictive features and that its products posed significant risk of harm, such as abuse, addiction, and compulsive use leading to physical injury;

   c.   Ubisoft Montreal and Ubisoft misrepresented the Rainbow Six games as safe for use by minors and young adults, while knowing they had been designed and developed with addictive psychological features to keep users playing Rainbow Six more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that Rainbow Six posed significant risk of harm to users, like G.D.;

   d.   DICE and EA misrepresented the Battlefield game series as safe for use by minors and young adults, while knowing that it had been designed with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that the Battlefield game series posed significant risk of harm; and

107

e.  Microsoft misrepresented that its Xbox Game Pass Ultimate and Xbox Cloud
Gaming were safe for use by minors and young adults, while knowing that it
was designed and developed with addictive features to keep users, like G.D.,
playing the games and spending money, and while knowing that abuse,
addiction, and compulsive use by youth can lead to injury, such that its products
posed significant risk of harm to users, like G.D.

556.    Defendant knew their games posed risk to minors, like G.D., based on internal
research and external studies known in the industry and to each Defendant; yet each Defendant
misrepresented the safety and value of their games for the purpose of inducing users, like G.D., to
purchase/download the game and to continue using Defendants' products to the addiction
knowingly caused by Defendants' products.

557.    Each Defendant also knowingly and recklessly misled the public—particularly
product users, and their parents, including Plaintiffs, into believing these products were safe or
even beneficial for children to use. These misrepresentations of material fact include, but are not
limited to:

a.  Epic Games marketed Fortnite as "educational" and for use in the classroom
despite knowing that its Fortnite games contained an inherent risk of abuse,
addiction, and compulsive use by youth and the harms that arise therefrom, and
that have been experienced by G.D.;

b.  Activision, Infinity Ward, Treyarch, and Sledgehammer Games marketed their
Call of Duty games for play by youth and directed their misstatements to youth
despite knowing that the Call of Duty games contained an inherent risk of

abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by G.D.;

c. Ubisoft Montreal and Ubisoft marketed Rainbow Six for play by youth and directed their misstatements at youth, despite knowing that its Rainbow Six games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by G.D.;

d. DICE and EA marketed its games for play by youth and directed their misstatements at youth, despite knowing their Battlefield games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by G.D.;

e. Microsoft knew that its Xbox Game Pass Ultimate and Xbox Cloud Gaming platforms, as well as Fortnite, the Call of Duty games, Rainbow Six, and the Battlefield games, contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but intentionally marketed its platforms for play by youth and directed its misstatements towards users of Fortnite, the Call of Duty games, Rainbow Six, the Battlefield games, and other games designed, developed and utilized the patents and technology described herein.

558.   By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its respective products, and affirmative representations to the public, users, and parents, including Plaintiffs, that its products were safe,

each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

559.    Each Defendant knew that its misstatements and false representations, as identified herein, were material.

560.    The misrepresentations described herein were made to Plaintiffs—particularly to G.D.—prior to their purchase of each Defendant's product and to G.D. while he was using Defendants' products as intended.

561.    Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

562.    G.D. and their parents, Casey and Thomas Dunn, relied on Defendants' material misstatements and false representations in deciding whether to use, or continue to use, each of Defendants' products; specifically, Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

563.    Plaintiffs' reliance on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game transactions in each Defendant's product was justifiable.

564.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, *i.e.,* Defendants' deceit, Plaintiffs were not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiffs justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

110

565.    As a direct and proximate result of each of the Defendant's material misrepresentations and false statements, *i.e.,* Defendants' deceit, Plaintiffs have been damaged. Such damage includes G.D.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; G.D.'s inability to attend school; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to G.D.'s physical and mental injuries. G.D.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

566.    Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

567.    Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT X
## DECEIT/FRAUDULENT OMISSION OR NONDISCLOSURE
### (Against All Defendants)

568.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

569.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing,

advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

570.    As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

571.    Each Defendant could have disclosed the defective condition of its respective products to the public and advised that the products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

572.    Each Defendant intentionally and knowingly did not disclose the serious safety risks presented by its respective products.

573.    Each Defendant intentionally omitted or knowingly did not disclose material facts about their respective products, or their collective use of patents designed to addict players to Defendants' products. For instance:

> a.  Epic Games did not inform the public, users, or parents, including Plaintiffs, that Fortnite posed significant risk of harm due to Defendants' decision to design Fortnite to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury;
>
> b.  Activision, Infinity Ward, Treyarch, and Sledgehammer Games did not inform the public that they designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury;

c. Ubisoft Montreal and Ubisoft did not inform the public that they designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury;

d. DICE and EA did not inform the public that the Battlefield game series posed a significant risk of harm to the public, including G.D., because it was designed with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, despite their knowing that abuse, addiction, and compulsive use by youth can lead to injury; and

e. Microsoft did not tell the public, including Plaintiffs, that it designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features, despite knowing that abuse, addiction, and compulsive use by youth can lead to injury.

574. Each Defendant knew of the risks associated with their respective products based on internal research and external studies known to the industry and each Defendant; yet, intentionally omitted and failed to disclose those findings, to induce youth, including G.D., to continue using their respective products.

575. Each Defendant knew that its omissions and nondisclosures were material.

576. A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

577.    If Defendants had not omitted material facts regarding the safety of their products, Plaintiffs would not have purchased, downloaded, played, continued to use, and/or purchased downloadable game content or in-game transactions in each Defendant's product.

578.    As a direct and proximate result of each Defendant's material omissions and intentional nondisclosures, Plaintiffs had no reason to believe that each Defendant's products were unsafe for children to use.

579.    As a direct and proximate result of each Defendant's material omissions and nondisclosures, Plaintiffs have been damaged. More specifically, each Defendant engaged in deceitful conduct through its fraudulent omissions and nondisclosure, and that deceitful conduct is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, harm, and damages described herein.

580.    Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

### COUNT XII
### FRAUDULENT CONCEALMENT
### (Against All Defendants)

581.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

582.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

583.    As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users, particularly minors and young adults.

584.    Each Defendant concealed the serious safety risks presented by its respective products. Defendants' acts of fraudulent concealment include, but are not limited to:

    a.  Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the publics and product users, including Plaintiffs;

    b.  Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the publics and product users, including Plaintiffs;

    c.  Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the publics and product users, including Plaintiffs;

      d.  DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the publics and product users, including Plaintiffs; and

      e.  Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the publics and product users, including Plaintiffs.

585.    Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings in order to induce youth, including G.D., to continue using its respective products and avoid losing users and revenue,.

586.    Each Defendant knew that its concealment was material.

587.    Each Defendant intended its concealment to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

588.    A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

589.    If Defendants had not concealed material facts about the safety of their respective products, including but not limited to concealing that the products had been designed to be

addictive, then Plaintiffs would not have purchased, downloaded played, continued to use, and/or purchased downloadable game content or in-game transactions in each Defendant's product.

590.    As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

591.    As a direct and proximate result of each Defendant's concealment of material information, G.D. has been injured and Plaintiffs have sustained damages, as described herein.

592.    Each Defendant took affirmative steps to conceal the true nature and risk posed by their respective products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying  an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore,  an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct is warranted.

593.    Defendants' fraudulent concealment tolls any applicable statute of limitations.

### COUNT XIII
### FRAUDULENT INDUCEMENT
### (Against All Defendants)

594.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

595.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video

117

game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

596.    Within these products, each Defendant included the ability for users, including Plaintiff, to purchase in-game downloadable content or microtransactions.

597.    Users of Defendants' products, including minors such as G.D., were induced into microtransactions by each Defendant to make such purchases through false representations and material misstatements built into each of the Defendants' products. Defendants' methods of fraudulent inducement include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, AI avatars or "friends" to encourage purchase, and disguised features of the Defendants' products, which misrepresent to users, like Plaintiff, that game-selected purchases would help them advance in the game or complete necessary missions.

598.    Defendants made these false representations and material nondisclosures with intent to induce G.D. into the microtransaction.

599.    At the time each Defendant utilized these technologies to induce G.D. to make in-game purchases, each Defendant knew that the representations made through the game were false and existed only to entice G.D. to continue spending.

600.    Each Defendant intended its fraudulent in-game content to induce G.D. to continue purchasing in-game downloadable content and/or in-game transactions within its respective product.

601.    At the same time, each Defendant knew that the inducements to make additional in-game purchases served only to increase users'—including G.D.'s—inherent risk of danger,

118

specifically a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

602.    G.D. reasonably relied on the enticements within each Defendant's product to make several in-game purchases that actually had little to no value to G.D. within the game.

603.    Had G.D. known that the representations in each Defendant's respective products regarding in-game purchases were false and fraudulent, G.D. never would have agreed to purchase in-game downloadable content or microtransactions.

604.    Furthermore, as detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

605.    Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly concealed those findings to avoid losing revenue and to induce G.D. to continue using each Defendant's respective products.

606.    In conjunction with Defendants' acts of concealment, each Defendant knowingly and recklessly misled the public, users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

607.    Each Defendant intended its concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

608.    By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its respective products, and reassuring the public, users, and parents,

including Plaintiffs, that its products were safe, each Defendant did fraudulently induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product..

609.    G.D. was induced into microtransactions resulting in over $3,000 spent on in-game purchases or microtransactions.

610.    Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, like G.D., would be induced into spending money that they would not spend on Defendants' products if they knew the truth.

611.    A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products. Thus, Plaintiffs justifiably relied on each Defendant's material misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game transactions in each Defendant's product.

612.    As a direct and proximate result of each Defendant's fraudulent inducement, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's respective products, and/or purchasing downloadable game content or in-game transactions in each Defendant's product.

613.    As a direct and proximate result of each of the Defendant's concealment of material information, Plaintiffs have been financially and otherwise harmed through each of the

Defendant's inducements to utilize their platforms, download and play their games, and/or continuously spend funds through its products.

614.    As a direct and proximate result of each Defendant's fraudulent inducement Plaintiffs have been damaged. More specifically, each Defendant engaged in deceitful conduct through its fraudulent omissions and nondisclosure, and that deceitful conduct is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, harm, and damages described herein.

615.    Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT XIV
## CIVIL CONSPIRACY
### (Against All Defendants)

616.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

617.    A civil conspiracy occurs when two or more persons have combined to accomplish a purpose that is unlawful or oppressive, or to accomplish some purpose (that is not in itself unlawful, impressive, or immoral) by unlawful, oppressive, or immoral means to the injury of another. Such a conspiracy occurred here.

618.    Defendants conspired to addict users, like G.D., to Defendants' gaming products..

619.    As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like G.D., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by G.D. and other users.

620.    Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like G.D., addicted to Defendants' products.

621.    More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like G.D, with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

622.    As described herein, Activision, Infinity Ward, Treyarch, and Sledgehammer Games knowingly conspired and otherwise acted in concert to violate the ADTPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into contracts for purchase, and design the Call of Duty game series to addict minors and young adults.

623.    In particular, Activision, Infinity Ward, Treyarch, and Sledgehammer Games knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Call of Duty games that addicted and harmed G.D.

624.    As described herein, DICE and EA conspired and otherwise acted in concert to violate the ADTPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into contracts for purchase, and design the Battlefield game series to addict minors and young adults.

625.    In particular, DICE and EA knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Battlefield games that addicted and harmed G.D.

626.    As described herein, Ubisoft Montreal and Ubisoft conspired and otherwise acted in concert to violate the ADTPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into contracts for purchase, and design the Rainbow Six game series to addict minors and young adults.

627.    In particular, Ubisoft Montreal and Ubisoft knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Rainbow Six games that addicted and harmed G.D.

628.    As described herein, Microsoft conspired with and acted in concert with Activision, Infinity Ward, Treyarch, Sledgehammer Games, Epic Games, DICE, EA, Ubisoft Montreal, and Ubisoft to distribute, market, supply, and/or sell the Call of Duty, Fortnite, Battlefield, and Rainbow Six video games and all in-game downloadable content and in-game purchases contained

therein through Xbox Game Pass in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

629.    Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its respective product to users, including G.D., while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries).

630.    Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harms in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including G.D.

631.    These conspiracies allowed Defendants to maximize profits, all while causing users significant harm.

632.    Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies described herein.

633.    The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

634.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conspiring to make their games addicting, G.D. continues to suffer injuries and is unable to stop using Defendants' respective products as a result of their addiction, Defendants' defective design and Defendants' failure to warn consumers, like G.D., about the addictive qualities and components of those products.

**COUNT XVII**
**LOSS OF CONSORTIUM**
**(Against All Defendants)**

635.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

636.    Consortium may be generally defined as the comfort, society, affection, services, and other indefinable elements reasonably expected from the injured person.

637.    As a direct and proximate result of the aforesaid careless, intentional, negligent, deceptive, fraudulent, reckless, willful, immoral, and unlawful acts on the part of each Defendant, and by reason of the personal injuries sustained by G.D., Casey Dunn has sustained damages—including great mental anguish and emotional distress---and may sustain such damages in the future by reason of her child's injuries and a resulting loss of her child's services, society, love, companionship, and familial relationship she once enjoyed with G.D.

638.    As a direct and proximate result of the aforesaid careless, intentional, negligent, deceptive, fraudulent, reckless, willful, immoral, and unlawful acts on the part of each Defendant, and by reason of the personal injuries sustained by G.D., Thomas Dunn has sustained damages—including great mental anguish and emotional distress---and may sustain such damages in the future by reason of his child's injuries and a resulting loss of his child's services, society, love, companionship, and familial relationship she once enjoyed with G.D.

## VII.    PRAYER FOR RELIEF

639.    Plaintiffs Casey Dunn, Individually and On Behalf Of G.D., a Minor, and Thomas Dunn respectfully request judgment in their favor and against each of the Defendants to the full extent of the law, as follows:

a. For an award of compensatory damages for G.D. in an amount to be determined at trial on the following elements of damage:

    i. The nature, extent, duration, and permanency of G.D.'s injuries;

    ii. The reasonable expense of all necessary medical care, treatment, and services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

    iii. The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future;

    iv. The pain, suffering, and mental anguish experienced in the past;

    v. The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

    vi. The present value of any loss of ability to earn in the future;

    vii. Any scars, disfigurement, and visible results of G.D.'s injuries;

    viii. The reasonable expense of any necessary help in G.D.'s home which has been required as a result of G.D.'s injuries;

    ix. The present value of any necessary help in G.D.'s home reasonably certain to be required in the future; and

    x. G.D.'s inability to attend school;

b. For an award of compensatory damages for Casey Dunn, in an amount to be determined at trial, to fairly compensate her for the reasonable value of any loss of the services, society, companionship, and familial relationship she once enjoyed with her child, G.D.;

c.  For an award of compensatory damages for Thomas Dunn, in an amount to be determined at trial, to fairly compensate him for the reasonable value of any loss of the services, society, companionship, and familial relationship of his child, G.D;

d.  For an award of actual damages, including economic and pecuniary loss, in an amount to be determined at trial;

e.  For an award of statutory damages in an amount to be determined at trial;

f.  For an award of punitive damages in an amount to be proven at trial;

g.  For an award of costs and attorneys' fees, as allowable by law;

h.  For pre-judgment and post-judgment interest, as allowable by law; and

i.  For such other and further relief as this Court may deem just and proper.

## VIII.    JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

Plaintiffs Casey Dunn, Individually and on behalf of G.D., a minor, and Thomas Dunn

/s/ Breean Walas

**BULLOCK WARD MASON LLC**
Breean Walas (AR2006077)
Tina Bullock*
Danielle Ward Mason*
Rachel Minder*
Leslie Pescia*
3350 Riverwood Pkwy, Suite 1900
Atlanta, GA 30339Tel:
(833) 296-5291
bwalas@bwmlaw.com
tbullock@bwmlaw.com
danielle@bwmlaw.com

rminder@bwmlaw.com
lpescia@bwmlaw.com

*Attorneys for Plaintiffs*

**\*motions to appear pro hac vice
pending*